Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| STACEY KUSABA, MATTHEW HERRON, and EVA BRAUNTHAL,<br><br>Plaintiffs,<br><br>vs.<br><br>APPLE INC., APPLE BENEFITS BOOK, UNITED HEALTHCARE INSURANCE COMPANY, and UNITED BEHAVIORAL HEALTH, INC. *operating as* OPTUMHEALTH BEHAVIORAL SOLUTIONS.<br><br>Defendants. | **Complaint**<br><br>Case No.<br><br>Judge |

**COME NOW** Stacey Kusaba, Matthew Herron, and Eva Braunthal, collectively and individually and through their undersigned counsel, complain and allege against the above captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiffs Stacey Kusaba, Matthew Herron, and Eva Braunthal ("Stacey", "Matthew, and "Eva" individually and "Plaintiffs" collectively) are natural persons residing in Campbell, California.

2. The Plaintiffs have group health coverage through a self-funded employee benefit plan provided by Stacey's employer, Apple Inc.

3. Eva is Stacey's daughter and Matthew's stepdaughter. She received treatment at Vista Sage ("Vista") a licensed health care facility located in the State of Utah, which provides residential treatment and therapy to adolescents with mental, behavioral and substance abuse problems.

4. Apple Inc. is a corporation that does business globally, including Utah.

5. Apple Benefits Book for full-time employees ("the Plan") is a self-funded employee benefit plan sponsored by Apple Inc. for its employees and their dependents.

6. Apple Inc. is the plan administrator, and United Behavioral Health, Inc. is the claims administrator for Eva's mental health claim.

7. As the entity responsible for making mental health and substance abuse benefit determinations on behalf of the Plan, and as the entity responsible for developing internal practices and policies to facilitate such determinations, United Behavioral Health is an ERISA fiduciary.

8. United Behavioral Health is an affiliate of UnitedHealthcare Insurance Company, and sometimes operates as OptumHealth Behavioral Solutions. These three entities will be collectively referred to as "United."

9. United both insurers and provides claim administration for Utahans and out-of-state residents alike.

10. The Plan covers the Plaintiffs and is an employee welfare benefits plan under 29 U.S.C. §1001 et. seq. of the Employee Retirement Income Security Act of 1974 ("ERISA").

2

11.     This is an action brought under ERISA. This Court has jurisdiction of this case under 29 U.S.C.§ 1132(e)(1).

12.     Venue is appropriate under 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1391(c) because the Defendants do business in the State of Utah, the Plan's claims administration was done in Utah, Eva's Medical care was provided in Utah, and the Plaintiffs' financial obligations for Eva's care were incurred in Utah.

13.     ERISA's nationwide service of process provision and 28 U.S.C. §1391 also make jurisdiction and venue appropriate in the District of Utah.

14.     Plaintiffs seek payment of Eva's denied claims from February 4, 2015 through August 14, 2015, pursuant to 29 U.S.C. §1132(a)(1)(B) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

15.     The remedies Plaintiffs seek under the terms of ERISA and under the terms of the Plan are for benefits due them pursuant to 29 U.S.C. §1132(a)(1)(B), and for an award of interest and attorney fees under 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

### Eva's Behavioral and Substance Abuse History

16.      Eva is the youngest of three children. At four years-old, Eva's biological father left her family. She saw him once or twice a year; he was not interested in being a prominent part of her life.

17.     At eight years-old, Eva was diagnosed with Crohn's Disease, after dealing with undiagnosed illness for about a year previously. Her symptoms at this time were low weight,

anemia, extremely low energy, daily headaches, and abdominal pain. Sometimes her symptoms were so severe, she struggled to walk.

18. During this time, Eva visited the hospital numerous times. She took medications with uncomfortable and embarrassing side-effects. Classmates began teasing her, and she struggled to connect with other kids and feel "normal."

19. By ten years-old, Eva was exhausted from all the medical interventions she underwent. Still in pain, she began to refuse treatments, as she claimed they did nothing to alleviate pain, but caused her significant distress.

20. By the time Eva entered junior high school, she had undergone significant trauma from all of her medical issues and the bullying she experienced. By the Spring 2011, she had began cutting herself to deal with all of her emotional trauma.

21. In September of 2011, Eva disclosed to her mother that she wanted to kill herself. She had developed a plan, and was distressed by her desire to hurt herself. She spent three nights in Fremont Hospital, a psychiatric hospital. Eva hated the experience and learned what not to say in order to avoid going back to a psychiatric hospital.

22. Eva began seeing a psychiatrist, who prescribed various anti-depressants and mood stabilizers, but also recommended therapeutic interventions. Eva struggled to connect with the first few therapists she tried. She began to shut down in response to all the failed interventions and instead insisted she was "fine."

23. Throughout this process, Eva continued to self-harm. Sharp objects were taken from her, but she found creative ways to hurt herself and even began burning her body.

24. By the time Eva entered high-school, she had developed a number of maladaptive ways of dealing with her emotions. She began using drugs and possibly alcohol during this time. Her grades plummeted, which was shocking because she had always been a good student previously.

25. A boy sexually assaulted Eva at a party during this time. He blamed the entire event on her and spread rumors about her. This devastated Eva further, and made her feelings of isolation and being misunderstood even more intense.

26. During her sophomore year of high school, Eva's biological father began communicating with her more. Unfortunately, Eva's biological father did not believe in medications, even for conditions like Crohns, and Eva began throwing her medications away instead of taking them. He also expressed his disbelief in therapy, which made Eva even more disengaged in therapy. She began to believe that if she moved to Hawaii to live with her father, all of her problems would go away.

27. Eva began acting out even more in an effort to convince her parent's divorce mediator to let her move to Hawaii to be with her dad. She began cutting classes, taking more street drugs, and binge drinking.

28. One Saturday, Eva became so intoxicated that she required hospitalization. This is when her mother and step-father discovered Eva had been stealing to gain access to drugs and alcohol. She insisted that moving to Hawaii would solve all of these problems, and the mediator agreed to let her live with her father on a trial basis.

29.     Eva started her junior year of high school in Hawaii. Her behaviors only got worse—she failed most of her classes, skipped her appointments, cut classes, and continued to abuse drugs and alcohol.

30.     On one occasion, she blacked out and fell on her face and broke a tooth. This was a wake-up call for Eva, as she had never gotten so significantly hurt from drinking before. Eva was suspended from school during this time.

31.     Eva's biological father tried to keep all of this information away from Eva's mother and step-father, but soon all the facts came out. It was revealed that on top of everything else, Eva's biological father had been smoking marijuana with his daughter, and his parents had Eva over regularly to drink alcohol with them.

32.     Eva's psychologist in Hawaii was very concerned about Eva. She outlined possible treatment options, and soon Eva moved back to California to receive treatment for her mental health, behavioral, and substance abuse problems.

33.     Eva entered Aspiro on November 23, 2015. There, even worse facts came out about Eva's time with her father. While in Hawaii, Eva began using cocaine. Her mood and self-esteem had hit an all time low, and she no longer cared about herself or her safety.

34.     Eva had sex with older men in exchange for drugs and alcohol in Hawaii. This is statutory rape. She was always high when this would happen, which means she was also raped as an intoxicated person incapable of consent.

35.     Eva ended treatment at Aspiro to enter treatment at Vista in February 2015. This was the next step in the treatment plan devised by Eva's team of mental health professionals and

6

her mother and step-father. They felt that Eva needed further treatment at Vista to recover from the significant trauma she had endured in her short life.

36. Eva received treatment at Vista Sage from February 4, 2015 through August 14, 2015.

### Pre-Litigation Appeal of the Plan's Denial of Coverage for Eva's Care

37. Claims were submitted by the Plaintiffs to United for coverage of Eva's treatment at Vista.

38. United denied coverage for Eva's treatment at Vista on the basis that it was not medically necessary in a letter dated February 8, 2015.

39. This letter was mailed and addressed to Jeffery Kovmick, M.D. of Vista Adolescent Treatment Center at 8265 W 2700 S, Magna UT 84044.

40. Jeffery Kovnick's named is spelled with a "n" not an "m," and Eva attended Vista Sage, which is located at: 3149 East 9800 South, Sandy UT 84092.

41. This denial letter is addressed to Jeffery Kovmick, but then begins with, "Dear Parent of Eva Braunthal."

42. This denial letter was never sent to Eva's parents.

43. Dr. Kimberly Pitts-Davis, M.D., Eva's primary care physician since March 27, 2008, submitted a letter of Medical necessity dated September 23, 2015. In this letter, she detailed Eva's mental health struggles, highlighting her self-harm, substance abuse, and failing grades. She argued that Eva needed the treatment at Vista for her "suicidal ideation, substance abuse, Crohn's disease, and asthma."

7

44. Dr. Lauren Emoto-Barnhill, Psy.D., Eva's clinical psychologist from July 2014- to November 2014, also submitted a letter of medical necessity. In this letter, Dr. Emoto-Barnhill wrote:

> Eva reported clinically significant symptoms of emotional distress that negatively impacted her mood. Her symptoms included feelings of sadness and hopelessness, self-harmful behavior, risk-taking behavior, poor interpersonal relationships, and poor coping skills. Her depression affected her ability to function in multiple environments, such as home, school, work, and the community…Eva had already been previously hospitalized, and was also failing classes and was increasingly disruptive at home. My assessment was that Eva could benefit from wilderness therapy or residential treatment, as other options did not seem to fit her needs…

45. United then requested additional information supporting the medical necessity of Eva's treatment in a letters dated February 12, 2016 and March 11, 2016.

46. Plaintiffs provided the requested medical records on March 11, 2016.

47. The UnitedHealthcare Central Escalation Appeals Unit responded to a provider appeal dated March 4, 2016 in a letter dated March 19, 2016. Plaintiffs do not have a copy of this March 4, 2016 letter and will be requesting a copy during discovery.

48. The March 19, 2016 response letter is addressed to Eva Braunthal, even though it is responding to information presented by Eva's provider.

49. In that letter, UnitedHealthcare Central Escalation Appeals Unit wrote:

> Upon further review of your request, we determined the questions and concerns expressed in your correspondence do not qualify as an appeal. As a result, your letter and any attached documents have been forwarded to the appropriate UnitedHealthcare department for review. You will receive a response to your issues shortly.

8

50. No further information was sent to Eva Braunthal as a follow up to this March 19, 2016 letter.

51. Without receiving a copy of the February 8, 2015 denial letter, Eva's mother Stacey appealed the denial of her daughter's treatment based on the Explanation of Benefits she was receiving in the mail.

52. Stacey made a formal request for a Level One Member Appeal of Eva's treatment in a letter dated September 23, 2016.

53. In her appeal, Stacey asked for a "full clinical justification" as to why her Eva's treatment was not medically necessary. She wrote, "It is difficult, if not impossible, to advocate for my daughter's care if you do not provide me with the clinical justification for your denial."

54. She also argued that United violated ERISA regulations that require a specific reason for denial, complete with references to Eva's medical record to support a denial based on medical necessity.

55. She also noted that United failed to provide "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary", which is also required by ERISA regulations.

56. Stacey then asked for the medical reviewer who was responsible for denying Eva's treatment to have his or her qualifications revealed, pursuant to ERISA regulations.

57. Stacey then detailed Eva's mental health history as evidence of the medical necessity of her daughter's treatment at Vista.

58. United responded in a letter dated October 25, 2016, stating: "According to your plan, in order to be valid, *an initial appeal request must be made within 180 days on [sic] the initial denial.*" (Emphasis added.)

59. The October 25, 2016 letter misquotes the Plan. The Apple Benefits Book states on page 282: "If a claim for health care, short-term disability benefits or long-term disability benefits is denied, you will have **180 days from** *receipt of notification of an adverse benefit determination to appeal.*" (Emphasis added.)

60. Plaintiffs never received the initial denial, they appealed Eva's claim from the Explanation of Benefits they were continuing to receive in the mail.

61. Stacey responded to this with a request for an external review of the denial of Eva's treatment in a letter dated January 10, 2017.

62. She also detailed the numerous mishandlings of her appeals, beginning with the failure of United Healthcare to provide a prior authorization decision to Eva's providers at Vista Sage at the beginning of Eva's treatment.

63. Since no denial was ever received, Stacey wrote about how she hired a healthcare advocacy group to submit claims for Eva's treatment. When United requested medical records as evidence of medical necessity on February 12, 2016, records were delivered to United on March 11, 2016.

64. After many months of not receiving an outcome from United's review of the medical records submitted, Stacey's healthcare advocacy group (hereafter "Stacey's representatives") called to inquire about the status of Eva's claim. In a call dated July 26, 2016, a

United representative named Elcie told Stacey's representatives that Eva's claim had been denied because the records were not received within 45 of the February 12, 2016 request.

65. This is not true, as the requested records were sent on March 11, 2016.

66. When Stacey's representatives called again on September 6, 2016, they were told that Eva's claim had been denied for medical necessity as far back as March 29, 2016.

67. Stacey expressed her frustration with this information as multiple calls had been placed to United between March 2016 and September 2016, and no one had ever shared that information regarding the medical necessity denial with her or her representatives in any of those calls.

68. Stacey went on to explain how she then requested a Level One Appeal based on the information she had received via the Explanation of Benefits denying Eva's treatments. She sent that request for an appeal via certified mail on September 26, 2016.

69. Only after receiving the October 25, 2016 denial for untimeliness did Stacey learn about the existence of the February 8, 2015 denial letter that she never received.

70. The February 8, 2015 denial was then faxed to Stacey's representative on December 12, 2016.

71. Stacey went on to quote the Apple Benefits Book in her appeal letter, which states on page 282:

> If a claim for health care, short-term disability benefits or long-term disability benefits is denied, you will have **180 days from *receipt of notification of an adverse benefit determination to appeal."***

(emphasis added.)

11

72. Stacey then concluded her letter by arguing that since she did not receive any notification of an adverse benefit determination until December 12, 2016, her Level One Appeal request was not untimely.

73. She then concluded her appeal letter with a request that her September 23, 2016 appeal be processed as timely.

74. United responded in a letter dated January 30, 2017. In this letter, they denied Eva's claim for being untimely, this time stating, "According to your plan, in order to be valid, an initial appeal request must be made *within 180 days of the last date the claim was processed or denied…*"

75. This is not what the Plan states. The Apple Benefits Book states on page 282: "If a claim for health care, short-term disability benefits or long-term disability benefits is denied, you will have **180 days from** *receipt of notification of an adverse benefit determination to appeal."* (Emphasis added.)

76. Stacey and Matthew appealed this denial in a letter dated April 10, 2017. In this letter, they reiterated the arguments made in their previous appeal letters, focusing heavily on the administrative errors committed by United.

77. United responded by upholding its denial of Ava's claim in a letter dated July 11, 2017.

78. In that letter, United stated that it "confirmed that the claims were processed correctly" and explained that it relied on the documentation presented, the terms of the Apple Benefits Book, and the applicable reimbursement policies in reaching its decision.

79. United then identified UnitedHealthcare Medical Director Svetlana Libus, MD, as the medical reviewer for Ava's appeals. United stated that Dr. Libus specialized in Psychiatry.

80. United then quoted Dr. Libus' rationale for denial:

> I reviewed your medical record and it is my opinion that your condition did not meet criteria for this level of care. You could have been treated in a less-intensive level of care. In your case, you were not feeling like harming yourself or others. You were not hearing or seeing things that others don't. You were able to look after your day-to-day needs. You did not have severe medical problems that would require this level of care. You were cooperative, appropriate, and compliant. You were willing and able to participate in your treatment. You had supportive family.
>
> The request cannot be approved at this time by your health plan. Instead, you could have continued care in the mental health outpatient setting with medication management, individual, and family therapy.

81. Eva's parents responded to this letter in a Level Two Appeals request dated September 7, 2017.

82. In this appeal, Eva's parents noted that Dr. Libus relied upon criteria not found in the Optum Level of Care Guideline for Mental Health Residential Level of Care, and copied the correct criteria into the letter.

83. The Optum Level of Care Guideline for Mental Health Residential Level of Care criteria was created by United Behavioral Health, sometimes operating as OptumHealth Behavioral Solutions. The development and implementation of this criteria in the claims administration process is evidence of United's role as a fiduciary in this case.

84. Eva's parents noted all the various contradictions between Dr. Libus' rationale for denial and the correct criteria, like Dr. Libus' reliance on Eva's lack of desire to harm herself or

13

others, when such patients are not eligible for residential treatment under the correct Optum Level of Care Guideline for Mental Health Residential Level of Care guidelines.

85. Eva's parents then re-summarized Eva's medical, behavioral, and treatment history and asked the next reviewer to also look to their level one appeal.

86. Eva's parents also noted that United failed to take Eva's substance abuse history into consideration, and provided medical necessity evidence for the treatment of her substance abuse disorder in their appeal as well.

87. Eva's parents concluded their appeal by restating ERISA regulations that the next reviewer would be required to follow. They also requested a copy of all documents used to reach the next decision.

88. United responded by upholding the denial in a letter dated October 11, 2017. In this letter, United identified Optum Medical Director Natasha Sane, MD, who specialized in Psychiatry, as the medical reviewer for this appeal.

89. Dr. Sane upheld the denial for similar albeit less specific reasons as Dr. Libus, citing once again that Eva's lack of desire to harm herself or others as evidence for why she did not need residential treatment.

90. United also expressly denied that there was any error in Dr. Libus' review.

91. This denial letter was sent unsigned.

92. Eva's parents then requested an Independent Review on February 6, 2018, restating their previous issues with the appeals process, as United's denials varied very little.

93. AllMed Healthcare Management, the independent reviewer for United, also denied Eva's claim in a letter dated September 16, 2018.

94.     Eva's parents have incurred treatment expenses that have caused substantial hardship in light of the Plan's denial of coverage that exceed $68,000, charges that should have been paid by the Plan.

95.     The Plaintiffs exhausted their pre-litigation appeal process as required under the terms of the Plan and ERISA.

## CAUSE OF ACTION

**Claim for Benefits and Violation of Fiduciary Obligations 29 U.S.C. § 1132(a)(1)(B)**

96.     ERISA imposes higher-than-marketplace standards on Apple Inc., United, and other ERISA fiduciaries.  It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers. It must conform its conduct to a fiduciary duty of loyalty and may not make misrepresentations to its insureds. 29 U.S.C. §1104(a).

97.     ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials.  29 U.S.C. §1104(a)(1)(D) and §1133(2).

98.     Apple Inc. and United's actions or failures to act constitute a breach of its fiduciary duties to the Plaintiffs under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for Eva's claim denial, written in a manner calculated to be understood by the Plaintiffs; 2) by misrepresenting the terms of the Plan to Plaintiffs by misquoting the portion of the Plan United was basing its denials for untimeliness on; 3) by

failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the Eva's claim; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.

99. Furthermore, a very recent order came down from the Ninth Circuit regarding the overly restrictive nature of United's internal criteria for residential treatment, like the Optum Level of Care Guideline for Mental Health Residential Level of Care guidelines, proving that these criteria were too restrictive and their enforcement deceptive and a breach of United's fiduciary duties. *See Wit v. United Behavioral Health,* No. 14-cv-02346-JCS, 2019 U.S. Dist. LEXIS 35205 (N.D. Cal. Feb. 28, 2019).

100. Pursuant to *Wit*, United violated its fiduciary duties by promulgating improperly restrictive guidelines, which artificially decreased the number and value of covered claims thereby benefiting its corporate affiliates at the expense of insureds. In doing so, United elevated its own interests and those of its corporate affiliates above the interests of plan participants and beneficiaries, thus violating its fiduciary duties.

101. Apple Inc. and United also violated the Parity Act. Congress enacted the Parity Act as an amendment to ERISA, making it enforceable through a cause of action under 29 U.S.C. § 1132(a)(3) as a violation of a "provision of this subchapter." A.F. ex rel. Legaard v. Providence Health Plan, 35 F.Supp.3d 1298, 1304 (D.Or.2014); see also 29 U.S.C. § 1132(a)(3)(A)-(B).

102. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not

apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all Medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); see also IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

103.  The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which Medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

104.  The Plan violated the Parity Act by requiring that residential treatment patients "…(feel) like harming yourself or others" or "[see] things that others don't" or be unable to "look after your day to day needs" in order to have their treatment covered. This is per the opinion of Dr. Svetlana Libus, whom United explicitly stated did not make an error in rendering her decision. These extreme requirements are more appropriate for an *acute* level of care, not a *sub-acute* level of care like the residential treatment offered at Vista. United does not similarly hold medical/surgical patients to such extreme requirements when qualifying for sub-acute treatment, and thus violates the Parity Act by holding mental health patients to a standard "that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all Medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); see also IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

105.  If Dr. Libus and Dr. Sane (who parroted Dr. Libus in this respect) are correct in their decisions, than there is essentially no sub-acute treatment available for mental health

claims, as in order to be eligible, you have to meet acute care-type criteria, such as being a threat to yourself or others or breaking from reality and seeing and hearing things other people do not. The Apple Benefits Book does cover sub-acute care for medical surgical benefits. Thus, Apple Inc. and United violated the Parity Act when they failed to provide an analogous mental health or substance abuse benefit to skilled nursing or inpatient rehabilitation, such as the transitional care Eva received at Vista.

106.    The actions of Apple Inc. and the Plan in failing to provide coverage for Eva's treatment violate the terms of the Plan, ERISA and its underlying regulations, and the Parity Act.

107.    The actions of Apple Inc. and the Plan have caused damage to the Plaintiffs in the form of denial of payment of Eva's treatment.

108.    Apple Inc. and the Plan are responsible to pay for Eva's treatment claim along with pre-judgment interest and attorney fees and costs pursuant to 29 U.S.C. §1132 (g).

## **RELIEF**

WHEREFORE, Plaintiffs seeks relief as follows:

109.    Judgment in the amount of Eva's past due treatment claim from February 4, 2015 through August 14, 2015;

110.    Pre- and post-judgment interest on the past due benefits pursuant to U.C.A. §15-1-1;

///

///

///

///

111.	An award of attorney fees pursuant to 29 U.S.C. §1132(g); and

112.	For such further relief as the Court deems equitable.

RESPECTFULLY SUBMITTED this 14st day of March, 2019.

                              G. ERIC NIELSON & ASSOCIATES

                                /s/ Laura Nielson
                              Laura Nielson
                              Attorney for Plaintiff